**WO**

1
2
3
4
5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8
9

10   In re Allstate Insurance Company      )    MDL No. 1541
     Fair Labor Standards Litigation       )
11   ─────────────────────────────────     )
                                            )
12   Leonard Gaglione, et al.               )
                                            )
13                    Plaintiffs,           )    No. CV-04-0015-PHX-PGR
                                            )
14            vs.                           )
                                            )    ORDER and OPINION
15   Allstate Insurance Company, et al.,    )
                                            )
16                    Defendants.           )
     ─────────────────────────────────     )
17

18          Among the motions pending before the Court in this member action is

19   Defendants' Motion for Summary Judgment (doc. #56), which is directed at the

20   claims of plaintiffs Leonard Gaglione, Michael Aiken, and Maxine Slappy, who

21   have alleged violations of the overtime pay provisions of the Fair Labor Standards

22   Act.[1]  Having considered the parties' memoranda and the oral argument of

23   ───────────────────────

24          [1]  Subsequent to the filing of the summary judgment motion, the plaintiffs,
     pursuant to stipulation, filed an Amended Complaint (doc. #138) which dropped former
25   defendants Allstate Property and Casualty Insurance Co. and Allstate Indemnity Co.,
     and added defendant Allstate New Jersey Insurance Co.  Since the Court construes the
26   summary judgment motion as being directed at the Amended Complaint, that portion of
     the motion seeking the dismissal of the two former Allstate subsidiary defendants is
     moot.

1  counsel, the Court finds that there are no disputed issues of material fact and that
2  the defendants (collectively "Allstate") are entitled to summary judgment pursuant
3  to Fed.R.Civ.P. 56 because the plaintiffs are not entitled to overtime
4  compensation as a matter of law inasmuch as they fall within the FLSA's
5  exemption for employees "employed in a bona fide ... administrative ... capacity"
6  set forth in 29 U.S.C. § 213(a)(1).

7  <u>Background</u>

8  　　The plaintiffs are all former insurance adjusters employed by Allstate
9  Insurance Company's Property-Casualty Claims Service Organization ("P-
10  CCSO") in Hudson, Ohio.  The gist of the plaintiffs' basic contention is that they
11  should have been reclassified as non-exempt employees for FLSA purposes
12  once Allstate instituted its Claims Core Process Redesign ("CCPR") guidelines,
13  which were implemented in 1995 in order to resolve claims with more objectivity
14  and consistency, because the guidelines eliminated all adjuster discretionary
15  judgment and made them simply task completers.

16  　　A. Leonard Gaglione

17  　　Gaglione was employed by Allstate from September 15, 1985 to October
18  15, 2002.  After being an inside auto adjuster for two years he became an outside
19  property claims adjuster; from October 1999 forward, his job classification was
20  Staff Claim Service Adjuster.

21  　　Gaglione testified at his deposition that his primary duty as an outside
22  adjuster was to determine the scope of damages, and to negotiate and settle
23  claims, and that once a claim was assigned to him it was his responsibility to
24  handle the claim from beginning to end.

25  　　He also testified that from 1999 forward he received some 2-3 claims a
26  day, that part of his job was to set reserves, that if he did not settle the claim on

1  his first visit it was up to him to change the preset reserves to reflect his estimate
2  of what they should be set at, and that he set reserves and then changed
3  reserves as necessary without manager approval.

4       He also testified that it was his responsibility to determine coverage, that he
5  could extend coverage without manager approval, that in the beginning he could
6  deny coverage without manager approval although at some point in 2001 or 2002
7  it changed so that he had to make a recommendation to his manager to deny
8  coverage, and that his manager approved his recommendations for denying
9  coverage more often than not, that in determining coverage he normally
10 interviewed the policyholder and it was up to him to decide whether to record that
11 statement, that it was his job to determine the merits of a claim, that if he decided
12 a causation expert was necessary he would make that recommendation to his
13 manager and those recommendations were generally approved, that he used a
14 flow chart in making coverage determinations, that he could issue reservation of
15 rights letters with manager approval and he didn't know of any instance when his
16 manager disagreed with his recommendation for such a letter, and that if the
17 overall settlement was within his settlement authority he could settle the claim
18 without manager approval.

19      He also testified that in estimating losses he would decide whether an item
20 should be repaired or replaced although Allstate's position was that everything
21 was repairable and there were repercussions if he used his judgment to replace
22 something, that he used the Accupro software program to do estimates, that he
23 inputted measurements in Accupro using Allstate's strict guidelines for
24 measuring, that Accupro generated an estimate based on material cost and labor
25 cost, that he accepted Accupro's estimate 100% of the time, that he had no
26 authority to override Accupro although he did override Accupro's estimates of line

-3-

1  items, and that he overrrode Accupro when he thought it was the right thing to do

2  although the repercussions were severe.

3       He also testified that he to had to use a software program called Contents

4  Estimating System (CES) to get a fair replacement cost for customer's claimed

5  contents items valued at over $100, and that he supposed he had the authority to

6  override CES but didn't know why he would want to.

7       He also testified that he had the authority within Allstate's guidelines to

8  negotiate with the customer's contractor if that contractor's estimate was higher

9  than his own, that he could sometimes go above the estimate he gave, that he

10  had the authority to write a check in the field if the amount was within his

11  authority, that if he needed to hire a vendor to help him with the estimate process

12  he would make a recommendation to his manager who would approve it more

13  often than not, and that he could hire a specialty vendor like a swimming pool

14  contractor without approval if it was within his authority.

15       He also testified that between 1999 and 2002, Allstate was pushing to

16  settle smaller claims on the first visit and that he had a settlement amount of

17  $5,000 for that purpose, that he agreed that in 2001 he had four different

18  authority levels: $25,000 for auto property damage; $50,000 for non-auto,

19  property, fire, or something in the house; $25,000 for a CPL claim (damage

20  covered by homeowner's policy); and $2,500 for claim-handling expenses, that

21  he agreed that from the beginning of 2002 until he resigned his authority levels

22  dropped to $5,000, $5,000, $5,000, and $500, and that if the overall settlement

23  he thought was the right amount was above his authority he had to make a

24  recommendation to his manager and his manager would approve his

25  recommendation more often than not.

26       He also testified that it was his responsibility to look for the possibility of

-4-

1   subrogation in every file and that his manager more often than not agreed with

2   his recommendation that there was no subrogation, that it was his responsibility

3   to look for indicators of fraud and to refer the file to Allstate's special fraud unit if

4   he suspected fraud and that he did not need his manager's approval to transfer

5   the file.

6       He also testified that in order to evaluate his performance a quality

7   evaluator would reinspect his closed files, and that when it came time to do his

8   annual performance development summary (PDL) his manager (the FPL) would

9   review a sampling of his files, perhaps 10-20 files out of 400-500 files, and for his

10  quarterly review his FPL would review perhaps half a dozen files.

11      He also testified that he didn't know if there was a Claims Policies,

12  Practices and Procedures (CPPP) manual, that he had his own copy of the

13  CCPR manual and that he carried pieces of it with him such as checklists and

14  scripts, that he looked at the manual when he needed to, and that he was

15  exposed to the manual in that it was constantly being thrown in his face by the

16  people implementing it because he was always breaking it.

17      He also testified that he was aware as an adjuster that things he says to a

18  claimant are binding on the company so that it was important to be accurate in

19  what he said to a claimant, and that the adjustment he made was important to the

20  claimant.

21      Allstate has submitted uncontroverted evidence that in 2001 and 2002,

22  Gaglione received approximately 828 claims for processing or settlement, of

23  which he submitted only 12 files to his supervisor for review because the

24  recommended settlement was in excess of his individual authority, and nine of

25  the 12 recommendations were approved as submitted.

26

-5-

1

B. Michael Aiken

2    Aiken was employed by Allstate from September 30, 1996 to August 21,

3    2002, during which time he held positions as an inside adjuster, an inside

4    coordinator, and as an outside adjuster; he was never a casualty adjuster.  At the

5    time he quit he was a Senior Claims Service Adjuster working as an outside

6    property adjuster.

7    Aiken testified that in all of the various adjuster positions he held his

8    primary duty was to determine coverage, determine scope of damages, and

9    negotiate and settle claims.

10    He further testified that as an inside adjuster one of his responsibilities was

11    to set reserves and that he did not need manager approval to set reserves, that

12    as an outside adjuster, if he did not settle the claim on his first visit, he would set

13    the reserves based on what he thought was appropriate based on his view of the

14    scope of the loss and he did not need manager approval to do that, and that both

15    as an inside and outside adjuster it was his responsibility to change the amount of

16    the reserves if he thought it was necessary and he could do that without manager

17    approval.

18    He also testified that it was his responsibility as both an inside and outside

19    adjuster to determine coverage, that he could accept coverage without manager

20    approval, that if he thought coverage should be denied he would explain that to

21    his manager and most of the time his manager would agree with him, that in

22    undertaking the coverage determination investigation he would follow Allstate's

23    guidelines, that he would interview the claimant, that he could use his own

24    judgment to decide whether to record the claimant's statement, that he would

25    decide if he needed to talk to other witnesses, that if he thought he needed to hire

26    a causation expert he would recommend that to his manager and his manager

1   would more often than not approve his recommendation, and that there were
2   prewritten scripts and/or interview outlines to be followed in coverage
3   investigations and it varied whether he had to check those.

4       He also testified that one of his objectives as to every loss was to
5   determine if there was a basis for subrogation and that he made those
6   determinations without manager approval.

7       He also testified that as an outside adjuster determining the scope of the
8   damage there were steps he was required to take depending on the type of
9   damage, that it was up to him to decide whether things should be repaired or
10  replaced, that he used the Accupro software program to estimate damages, that
11  there were gaps in the Accupro program in that it did not take into account things
12  like a tightness in the labor market and he would take that into account in
13  adjusting the claim, that he had the ability to override the Accupro estimate if he
14  thought it was inaccurate and he often took the duty upon himself to do that but at
15  the risk of censure from management, that if he overrode Accupro it was his
16  obligation to explain why in the file and the test of why he did it was his good
17  judgment, that he would have to follow Allstate's guidelines as far as what he was
18  allowed to override in Accupro, and that he had judgment within Allstate's
19  parameters to do this or that and if he went outside those guidelines because he
20  thought it was the right thing to do he would take a hit on review.

21      He also testified that he used the CES computer program for estimating
22  contents damage, and that he basically followed Allstate's guidelines for
23  replacements costs versus actual cash value.

24      He also testified that if he and the insured's contractor had differing
25  damages estimates he would negotiate with the contractor within Allstate's
26  guidelines, that he never had the ability to go outside of Allstate's guidelines, and

1   that he couldn't come to an agreement with the contractor he would make a

2   recommendation to his manager but he couldn't answer whether or not his

3   manager would agree with his recommendation.

4       He also testified that it was fair to say that every claim he adjusted as an

5   outside adjuster involved some level of negotiations with an owner or contractor,

6   and that there was no script to use as far as actually talking to the person

7   although Allstate had guidelines on how to handle customers.

8       He also testified that as an outside adjuster he had final settlement

9   authority that varied but was probably in the $3000 -$5000 when he quit and that

10  he could settle claims within his authority without manager approval, and that it if

11  the proposed settlement was higher than his authority he would make a

12  recommendation to his manager (his FPL) and almost all of his estimates were

13  approved to some extent although his FPL would tweak and correct them.

14      He also testified that as an inside adjuster he did not visit the property but

15  he did make coverage determinations, that if he decided, using Allstate's

16  guidelines, that an outside adjuster or an independent contractor was needed he

17  would make that recommendation to his FPL and his recommendations were

18  approved more often than not, that once CCPR was instituted there were scripts

19  for everything and that he would not ask permission to do something that was

20  outside of the guidelines, that went he left his inside adjuster position he was

21  using Accupro and CES, and that as an inside adjuster he made the decision as

22  to how much verification he needed from the claimant regarding contents losses.

23      He also testified that he was trained to look for fraud indicators in his claims

24  files and that if the indicators met a numerical threshold based on a checklist he

25  would send the checklist to an adjuster in Allstate's special fraud unit.

26      He also testified that his highest settlement authority with Allstate was

-8-

1  $20,000 but he didn't know when that was[2], that at some point his authority level,

2  like everybody's at Allstate, was reduced, that his authority level got bump down

3  to the $5000 - $3000 range, that his final authority level as an outside adjuster

4  was $3,000, and that he did not disagree that Allstate records showed that his

5  authority levels for the four different types of claims went to $2,500, $5,000,

6  $2,500 and $500 in September 2001 and then, when he became an outside

7  adjuster, they went to $3,000, $3,000 and $3,500.

8          He also testified that they got training manuals when Allstate switched to

9  CCPR, that they had training classes in which they added notes to a CCPR

10 binder, that he didn't recall being familiar with the CPPP manual, that he could

11 not say if there was a CPPP manual at his Market Claims Office (MCO), that he's

12 not familiar with a CCPR practices and procedures manual and that he did not

13 recall looking up anything in a separate manual, that he kept his CCPR training

14 materials binder at his desk and that he initially referred to it quite often but then

15 less as time went on, that there was an initial customer contact  script he followed

16 as an inside coordinator, that there was a different initial contact script for an

17 inside adjuster, and he believed there was a similar script for an outside adjuster

18 but that he never went through any CCPR training as an outside adjuster, that

19 parts of the scripts dealt with certain phraseology they were to use and parts of

20 the scripts explained the claims process, and that he did not think there was an

21 actual script on how to do an investigation but that it was more of a checklist.

22         He also testified that as an adjuster he knew that if he committed

23

24 _____

25 [2] Aiken stated that he could not recall if Allstate's records, which stated that
between January 2001 and September 2001 his settlement authority levels were
$10,000 for auto property damage, $20,000 on non-auto, fire, and house-related claims,
26 $10,000 on CPL claims, and $1500 for expenses, were correct.

1  something to an insured he was binding Allstate and that Allstate could be held
2  accountable for what he said.

3  Allstate has submitted uncontroverted evidence that in 2001 and 2002,
4  Aiken received approximately 380 field claims claim files for processing or
5  settlement, and during those years he submitted only 31 files to his supervisor for
6  review because the recommended settlement was in excess of his individual
7  authority and 26 of those recommendations were approved as submitted.

8  C. Maxine Slappy

9  Slappy was employed by Allstate from June 10, 1996 until sometime after
10  her deposition was taken on March 7, 2003.[3]  She was a "represented" casualty
11  adjuster, *i.e.* she dealt with claimants who were represented by counsel.

12  Slappy testified that it was her responsibility for determining whether or not
13  the claimed loss was covered, that she could deny coverage without supervisor
14  approval if the injuries were minor, but if they were not she would make a
15  recommendation as to whether coverage should be denied.

16  She also testified that sometimes she could hire outside counsel to deliver
17  a coverage opinion without supervisor approval, that she could issue a
18  reservation of rights letter without supervisor approval, and that she could set
19  reserves beyond her personal settlement authority without supervisor approval.

20  She also testified that when a claim came to her without a liability decision
21  determination she would conduct a liability investigation which included doing a
22  scene investigation, that she could hire an accident reconstructionist or a vehicle
23  expert from a pre-approved list without supervisor approval if she thought one

24

25
26  [3]  Slappy was no longer employed by Allstate at the time the summary judgment motion was filed.

-10-

1  was necessary, that when a claim came to her with a liability determination

2  already having been made by another adjuster it was her responsibility to check

3  that determination to make sure it was correct, and that she would interview the

4  claimant if the claimant's attorney allowed it and she would interview other

5  witnesses.

6       She also testified that she would follow a liability matrix to determine what

7  recommended steps she needed to take in the claim investigation, that she did

8  not need supervisor approval to decide whether or not to take an optional step set

9  forth in the matrix, and that she could take steps not required by the matrix if she

10  wanted to without supervisor approval.

11      She also testified that she made liability determinations and assigned

12  percentages of fault to the claimant and others involved in an accident without

13  supervisor approval using a comparative negligence computer program that

14  recommended fault percentages based on what she inputted, that she could

15  override the comparative negligence recommendation if she didn't like it by

16  inputting different information, and that although it was required that she use the

17  comparative negligence program on every claim there were times when she

18  didn't use it because it was frustrating to use but she couldn't say whether she did

19  or did not use it more often than not.

20      She also testified that she regularly consulted Ohio traffic and negligence

21  laws in assigning percentages of fault, that she could negotiate liability with an

22  adjuster from a different insurer, that one of her responsibilities was evaluating

23  bodily injury damages in new claims, and if she received a claim file that already

24  had a damage estimate in it it was her responsibility to ensure the correctness of

25  it, and that if she didn't think it was correct it was her responsibility to explain to

26  the evaluation consultant (EC) why she thought the amount was incorrect and

-11-

1   make a recommendation as to the correct amount.

2         She also testified that she would use various evaluation tools such as
3   Colossus, Fast Track and Form 1098 to make damages evaluations, that it was
4   her responsibility to see that all of the relevant medical and other records were
5   collected before using one of the evaluation tools, that it was her responsibility to
6   spot any irregularities in the gathered information such as bills or treatment that
7   were out of the ordinary, that she used Fast Track in cases in which treatment
8   lasted less than 120 days, that Fast Track was a worksheet that came up with a
9   range based on the information she put in as to what general damages should
10  be, that she would have to add special damages such as medicals and lost
11  wages to that range, and that she did not need to have manager approval to
12  negotiate a settlement based on a Fast Track range.

13        She also testified that Colossus is another computer program that gives a
14  range of general damages based on inputted information, that before Colossus
15  came up with an evaluated settlement amount she had to first input her own
16  recommended amount which she based on her experience, that she often put a
17  damages evaluation in the file that was different from the Colossus figure but then
18  an EC did his or her own evaluation, that sometimes the EC would raise his or
19  her own evaluation based on her (Slappy's) recommendation, and that she could
20  decide whether or not a medical bill or course of treatment was reasonable
21  regardless of what the Medical Bill Review System program stated.

22        She also testified that once a settlement range had been arrived at she
23  was responsible for negotiating and settling the claim, that she could negotiate
24  directly with the claimant's attorney, that she had the power to bind Allstate to a
25  settlement during those negotiations, and that if she settled a case outside of the
26  settlement range without the EC's approval it would show up on a monthly

1   computer print-out.

2        She also testified that in litigated claims she worked directly with staff

3   counsel and outside counsel, that she approved the expenses of both staff and

4   outside counsel, that she sometimes assisted staff and outside counsel in

5   developing litigation plans, that she made recommendations to counsel about the

6   direction she wanted the litigation to take and that her recommendations were

7   followed about 89% of the time, that she attended pretrial settlement conferences

8   and mediations where she was the only Allstate representative with settlement

9   authority, and that she sometimes attended trials as Allstate's representative.

10       She also testified that it was her responsibility to make a determination as

11  to whether a case had subrogation potential, that it was her responsibility to

12  determine if one of her claim files should be sent to Allstate's special fraud unit

13  and she could transfer such a file without supervisor approval, and that her

14  Performance Development Summary for 1999 showed that she although she only

15  complied with the liability matrix 72.2% of the time she received a 100% accuracy

16  rating for her reviewed files and that she couldn't recall if she suffered any

17  consequences for not complying with the liability matrix.

18       Allstate has provided uncontroverted evidence that Slappy's personal

19  authority levels were $40,000 per bodily injury and $80,000 per claim file.

20  Discussion

21        Allstate bears the burden of establishing its contention that the FLSA's

22  administrative exemption applies to the plaintiffs.  Bothell v. Phase Metrics, Inc.,

23  299 F.3d 1120, 1125 (9th Cir. 2002).   FLSA exemptions are narrowly construed

24  against the employer and only apply to persons who are "plainly and

25  unmistakenly within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361

26  U.S. 388, 392, 80 S.Ct. 453, 456 (1960); Bothell, 299 F.3d at 1125.  Allstate is

1   entitled to summary judgment only if it establishes that there are no genuine

2   issues of material fact as to each element of the requisite regulatory test for

3   exemption. Bothell, at 1125.  The question of whether an employee's particular

4   activities exclude him from the FLSA overtime benefits is a question of law; the

5   question of how an employee spends his working time is a question of fact. Bratt

6   v. County of Los Angeles, 912 F.2d 1066, 1068 (9th Cir. 1990).

7           The parties agree that the Department of Labor's "short test" for

8   determining administrative employee status applies to the plaintiffs.  29 C.F.R.

9   § 541.214.[4]  At issue here is the second part of the short test, known as the

10  "duties test."[5]  This part of the test requires (1) that the employee's "primary duty

11  consists of ... [t]he performance of office or nonmanual work directly related to

12  management policies or general business operations of his employer or his

13  employer's customers", and (2) that the employee's duties include work "requiring

14  the exercise of discretion and independent judgment."  29 C.F.R. § 541.2 and

15  § 541.214; In re Farmers Insurance Exchange, Claims Representatives' Overtime

16  Pay Litigation, 481 F.3d 1119, 1127 (9th Cir. 2007)  The plaintiffs, although not

17  disputing that they performed "office or nonmanual work", dispute that they meet

18  the other elements of the duties test.

19

20

21

22      [4]  The DOL revised the implementing FLSA regulations effective August 23,
    2004, which was after the termination of the plaintiffs' employment.  While the revised
23  regulations are not retroactive, Kennedy v. Commonwealth Edison Co., 410 F.3d 365,
    369 (7th Cir. 2005), they are instructive since they do not represent a change in the law.
24  In re Farmers Insurance Exchange, Claims Representatives' Overtime Pay Litigation,
    481 F.3d 1119, 1128 (9th Cir. 2007).

25
        [5]  The parties agree that the first part of the short test is not an issue here
26  inasmuch as the plaintiffs each earned a salary of at least $250 per week.

1    A.  "Directly Related To" Factor

2         (1) Administrative/Production Dichotomy

3         The pertinent DOL regulation explains in part that job activities are "directly

4    related to management policies or general business operations" if they relate "to

5    the administrative operations of a business as distinguished from 'production' or,

6    in a retail or service establishment, 'sales' work." [6] 29 C.F.R. § 541.205(a).  The

7    regulation further explains that "[t]he administrative operations of the business

8    include the work performed by so-called white-collar employees engaged in

9    'servicing' a business as, for example, advising the management, planning,

10   negotiating, representing the business, purchasing, promoting sales, and

11   business research and control."  29 C.F.R. § 541.205(b).

12        The plaintiffs, in arguing that their work as adjusters was not directly related

13   to Allstate's management policies or general business operations, contend in part

14   _____

15        [6]  The "production" language of § 541.205(a) has led to application of what is
     referred to as the "administrative/production dichotomy".  The dichotomy "distinguishes
16   between work related to the goods and services which constitute the business' market
     place offerings and work which contributes to running the business itself".  Bothell v.
17   Phase Metrics, Inc., 299 F.3d at 1127 (Internal quotation marks omitted).  The Ninth
     Circuit generally recognizes that the administrative/production dichotomy of
18   § 541.205(a) is only one of the analytical tools useful to an administrative exemption
     determination, that the dichotomy is useful only to the extent that it helps to clarify the
19   phrase "work directly related to the management policies or general business
     operations" and that it is only determinative when the work "falls squarely" on the
20   production side of the line, and that it is appropriate in some cases to analyze the
     primary duty test without reference to the dichotomy. Id. at 1126-27.  *See also,* Webster
21   v. Public School Employees of Washington, Inc., 247 F.3d 910, 916 (9th Cir. 2001)
     (Court noted that the administrative work/production dichotomy must be applied
22   sensibly, since the "purpose of the dichotomy is to clarify the meaning of 'work  directly
     related to the management policies or general business operations,' not to frustrate the
23   purpose and spirit of the entire exemption.")
24        The new DOL regulations clarify the "production" language by saying that "an
     employee must perform work directly related to assisting with the running or servicing of
25   the business, as distinguished, for example, from working on a manufacturing
     production line or selling a product in a retail or service establishment."
26

-15-

1  that Allstate adjusters are engaged in production work since Allstate's MCOs are

2  in the business of handling claims and that the job of the adjusters is to produce

3  the investigation or claims files for Allstate.[7]

4      The Court is unpersuaded by the plaintiffs' arguments as to this issue.  In

5  agreement with the other federal courts that have specifically addressed the issue

6  of whether insurance company employees whose jobs involve claims

7  administration come within the FLSA's exemption, the Court concludes that the

8  plaintiffs' work adjusting insurance claims was administrative in nature.  The

9  undisputed evidence of record establishes that Allstate's "product" is the writing

10  and selling of insurance policies and that the administration of claims is only

11  ancillary to that product.[8]  *See e.g.*, Cheatham v. Allstate Insurance Co., 465 F.3d

12

13  [7] The plaintiffs support their argument that Allstate adjusters do not "service"
   Allstate's business for purposes of § 541.205(b) in part with the deposition testimony of

14  Christine Sullivan, one of the two Allstate vice-presidents in charge of the P-CCSO unit.
   Sullivan testified in part that she did not consider claims adjusters to be administrators

15  of Allstate, that the adjusters have no formal role in managing Allstate's infrastructure
   such as purchasing, budgeting, and staffing, or in the long-range planning of Allstate's

16  future, they don't handle payroll, perform human relations functions, handle corporate
   investments, set marketing strategy, engage in pricing insurance policies or financial

17  planning, prepare budgets, make decisions about staffing, or develop policy or prepare
   procedures for use in Allstate's claims organization.  Sullivan also testified that adjusters

18  do not develop policies and procedures for use by Allstate's claims department,
   although they are part and parcel of what Allstate does in determining claim practices,

19  policies and procedure in that Allstate solicits their opinions and their expertise if a claim
   process change needs to be made.  She further testified that the primary business of

20  Allstate's MCOs is to adjust claims, and that a large percentage of the claims which
   claims adjusters handle are routine matters.

21

22      [8] Allstate has submitted uncontroverted evidence that it is a full service

23  integrated insurance company and that in any given year the majority of its policies don't
   result in claims, e.g. that from 1996-2002, the number of homeowner policy holders who

24  filed claims nationwide ranged between 12.7% and 19% on an annual basis, and the
   number of auto policyholders filing claims nationwide ranged from 29% to 31.5%.

25      Allstate as also submitted an uncontroverted affidavit from Christine Sullivan

26  wherein she states that Allstate Insurance Company (AIC) is a full service integrated

1    578, 585 (5ᵗʰ Cir. 2006) (Court, noting that an insurance company's product is its

2    policies, concluded that Allstate insurance adjusters were administrative workers

3    because their duties did not include writing and selling insurance, rather their

4    duties fell within Allstate's administrative operations since the adjusters advised

5    management, represented Allstate, and negotiated on Allstate's behalf.);  In re

6    Farmers Insurance Exchange, 481 F.3d at 1131-32 (Court concluded that claims

7    adjusters for Farmers Insurance Exchange were administrative workers, not

8    production workers, notwithstanding that they represented FIE's claims handling

9    arm.); *accord*, Robinson-Smith v. Government Employees Insurance Co., 323

10   F.Supp.2d 12, 22 n.6 (D.D.C. 2004); Jastremski v. Safeco Insurance Companies,

11   243 F.Supp.2d 743, 753 (N.D.Ohio 2003); Palacio v. Progressive Insurance Co.,

12   244 F.Supp.2d 1040 (C.D.Cal. 2002); McLaughlin v. Nationwide Mutual

13   Insurance Co., 2004 WL1857112 *5 (D.Ore. Aug. 18, 2004).

14        Furthermore, the pertinent DOL regulation, 29 C.F.R. § 541.205(c)(5),

15   provided that the "directly related to management policies or general business

16   operations" test was met by "claims agents and adjusters", and the DOL, in an

17   opinion letter issued on November 19, 2002, acknowledged that it had long

18   recognized that insurance claims adjusters typically perform work that is

19   administrative in nature.  That interpretation by the DOL of its own regulation is

20   entitled to deference by the Court. In re Farmers Insurance Exchange, 481 F.3d

21

22   insurance company that does more than adjust claims, that P-CSSO is Allstate's claims
     department and is not a separate corporate entity, that AIC's claims adjusters do not
23   generate revenue for Allstate by adjusting claims, that Allstate does not charge a fee for
     adjusting claims made under its policies, that although AIC employees adjust claims
24   that arise on policies issued by former co-defendants Allstate Property & Casualty
     Insurance Co. and Allstate Indemnity Co. (which are AIC's subsidiaries), AIC is not
25   reimbursed by those entities for doing so, and that more than 70% of the claims handled
26   by AIC arise under the policies issued by AIC.

1    at 1129.

2              (2) Work of Substantial Importance

3          The DOL regulation, § 541.205(a), further explains that the phrase "directly

4    related to management policies or general business operations" limits the

5    administrative exemption to persons who perform work of "substantial

6    importance" to the management or operation of the business.  The only specific

7    argument that the plaintiffs make regarding this issue, for which they do not cite

8    any case law in support, is that their claims settlement work was not of

9    substantial importance to Allstate given they had limited authority to negotiate

10   claims and that claims-related matters of importance were delegated to claims

11   employees at higher levels of authority.

12         The Court is unpersuaded by this argument.  The plaintiffs do not dispute

13   that, as noted by the court in <u>Robinson-Smith v. Government Employees</u>

14   <u>Insurance Co.</u>, 323 F.Supp. 2d at 23, "most courts have agreed that insurance

15   adjusters, including auto physical damage adjusters, do work that is of substantial

16   importance to the employer's business operations and management policies."

17   (Internal quotation marks and brackets omitted.)  *See e.g.*, <u>Cheatham v. Allstate</u>

18   <u>Insurance Co.</u>, 465 F.3d at 586 (Court found that Allstate insurance adjusters fell

19   within the administrative exemption in part because their work was important to

20   Allstate's management policies and its general business operations.); <u>In re</u>

21   <u>Farmers Insurance Exchange Claims Representatives' Overtime Pay Litigation</u>,

22   336 F.Supp.2d 1077, 1103 (D.Or. 2004), *aff'd in part and rev'd in part on other*

23   *grds*, 481 F.3d 1119 (9th Cir. 2007) (Court found that the work of claims

24   representatives was of substantial importance to the insurer's business

25   operations and management policies because their decisions in such matters as

26   determining coverage, setting reserves, negotiating and settling cases within their

settlement authority, identifying and referring fraudulent claims, and identifying

potential subrogation have a substantial financial impact on the insurer and its

policyholders.);   Jastremski v. Safeco Insurance Companies, 243 F.Supp.2d at

755 (Court found that plaintiff insurance adjuster's duties were of substantial

importance because he had settlement authority up to $15,000, most of his

recommendations for higher settlements were accepted, and he was responsible

for determining coverage and setting reserves.)  *See also*, DOL's November,

2002 opinion letter (DOL noted that claims adjusters whose responsibilities

included settling claims within their established settlement authority and

recommending settlements in excess of their authority, setting the level of

reserves, and making decisions regarding coverage and fault or liability

performed work of substantial importance to the insurer.)

        The deposition testimony of the three plaintiffs establish that they were

responsible for making and/or recommending various decisions similar to those

found in other cases to be sufficient to meet the "substantial importance" test.

For example, all three made determinations about coverage, all three set and

adjusted company reserves associated with their claim files, all three evaluated

damages associated with the claim, all three made recommendations regarding

the need for experts and their recommendations were generally followed (and

Slappy could hire certain experts on a preapproved list without supervisor

approval), all three could negotiate final settlements binding on Allstate within

their settlement authority, all three made determinations regarding the potential

for subrogation, all three were responsible for identifying potentially fraudulent

claims and referring those claims to Allstate's special fraud unit, Gaglione made

recommendations regarding the need for reservation of rights letters and his

recommendations were always accepted and Slappy could issue reservation of

-19-

1  rights letters without managerial approval, and Slappy made liability

2  determinations regarding fault and comparative negligence.

3        B. Exercise of Discretion and Independent Judgment

4        The last factor of the short test requires that the employee must exercise

5  discretion and independent judgment in the course of his job duties.  Although the

6  plaintiffs contend that this means that the employee must "customarily and

7  regularly" exercise the required discretion and independent judgment, the Court

8  disagrees.  The Ninth Circuit, unlike some other courts, recognizes that the

9  "customarily and regularly" language of 29 C.F.R. § 541.2(b) applies only to the

10  long test, and that the short test requires only that the employee's work "include"

11  the use of discretion and independent judgment.[9] *See* O'Dell v. Alyeska Pipeline

12  Service Co., 856 F.2d 1452, 1454 (9th Cir. 1988) ("Under the 'Long Test' an

13  administrative employee qualifies as an exempt employee only if his job requires

14  that he "*customarily and regularly* exercise discretion and independent judgment.

15  29 C.F.R. § 41.2(b) (emphasis added [in original]." ... Under the Short Test,

16  O'Dell's job must only "*include* work requiring the exercise of discretion and

17  independent judgment" to qualify him as an exempt employee. 29 C.F.R.

18  § 541.2(e)(2) (emphasis added [in original]); 29 C.F.R. § 541.214.") (Internal

19  brackets omitted).

20  _____

21      [9] Although this case was commenced in the District of Ohio, which is within the

22  Sixth Circuit, the fact that the Sixth Circuit holds that the "customarily and regularly"
language also applies to the short test for the administrative exemption, *see* Schaefer v.

23  Indiana Michigan Power Co., 358 F.3d 394, 403 (6th Cir. 2004), is not controlling since
the generally accepted rule is that in MDL cases the law of the transferee court governs

24  issues of federal law. *See e.g.*, In re General American Life Insurance Co. Sales
Practices Litigation, 391 F.3d 907, 911 (8th Cir. 2004) ("When a transferee court

25  receives a case from the MDL Panel, the transferee court applies the law of the circuit in
which it is located to issues of federal law."); *accord*,  In re Temporomandibular Joint

26  Implants Product Liability Litigation, 97 F.3d 1050, 1055 (8th Cir. 1996).

1    The plaintiffs generally argue that they did not exercise the required

2    discretion and independent judgment after the implementation of the CCPR

3    because thereafter their activities were "highly circumscribed and directed by

4    numerous requirements, decision matrices, and managerial oversight."  They

5    note in part that adjusters handling certain types of claims were required by the

6    CCPR to use scripts and form letters when communicating with an insured or

7    claimant, and that their evaluations of claims was constrained by the required use

8    of various valuation and claim adjustment software programs like Colossus for

9    casualty adjusters, and Accupro and CES for property damage adjusters, which

10   programs generated a narrow settlement range. The plaintiffs further argue that

11   they did not have the required discretion and independent judgment because they

12   were merely applying skills or knowledge in following prescribed procedures and

13   because they subjected to very close supervision given that, to ensure that the

14   CCPR processes were strictly adhered to, Allstate established "a regime that

15   reviews, tracks, observes and re-inspects every aspect of its adjusters'

16   investigations, evaluations and negotiations of claims."

17   The Court is unpersuaded by the plaintiff's arguments inasmuch as the

18   undisputed evidence establishes that the plaintiffs exercised sufficient discretion

19   and independent judgment to come within the administrative exemption.  First,

20   while the pertinent DOL regulation provides in part that the required discretion

21   and independent judgment implies the power to make an independent choice

22   with respect to matters of significance free from immediate supervision, it also

23   provides that the necessary discretion and independent choice may consist of

24   recommendations for action rather than the actual taking of action and that the

25   fact that the employee's decision may be subject to review and may on occasion

26   be revised or reversed after review does not mean that the employee is not

1   exercising discretion and independent judgment. 29 C.F.R. § 541.207(a) and (e);

2   In re Farmers Insurance Exchange, 481 F.3d at 1130; Cheatham v. Allstate

3   Insurance Co., 465 F.3d at 585.  *See also*, DOL November 2002 opinion letter

4   (DOL, noting that an employee is not required to have unlimited authority with a

5   complete absence from review in order to be exempt, opined that claims

6   adjusters who make decisions regarding coverage and liability, who have

7   complete authority to settle claims within their authority level, whose

8   recommendations to their supervisors regarding settlements above their authority

9   are frequently accepted, who are responsible for settling claims above their

10  authority once permission from their supervisors is obtained, and who work with

11  counsel if litigation ensues, possess the required discretion and independent

12  judgment because they are not merely pursuing a standardized format for

13  resolving claims.)

14        The plaintiffs' testimony establishes that they made key decisions on key

15  issues that were important to both Allstate and its claimants and that they made

16  these decisions either without supervisory review or, if review was required, that

17  they made recommendations that were followed most of the time.  For example,

18  all three set and changed reserves as necessary without manager approval, all

19  three extended coverage without manager approval, all three made

20  recommendations regarding denial of coverage and Gaglione's and Aiken's

21  managers accepted their recommendations more often than not, all three

22  conducted interviews of policyholders and witnesses as they deemed necessary,

23  all three were responsible for checking for fraud indicators and could refer cases

24  to the fraud unit without manager approval, and all three settled cases within their

25  authority without manager approval and Gaglione and Aiken made

26  recommendations regarding higher settlements that their managers accepted

-22-

1  more often than not.  In addition, Slappy had significant authority regarding

2  litigated cases that included approval of the expenses of staff and outside

3  counsel and attending pretrial conferences and mediations where she was the

4  sole representative with settlement authority, and she made recommendations to

5  counsel about the direction she wanted litigation to take which were followed a

6  large majority of the time.

7       Second, the fact that the plaintiffs had to follow the guidelines of the CCPR

8  and used estimating software does not make them non-exempt employees.  *See*

9  Cheatham, 465 F.3d at 585 ("[T]he requirement that Allstate adjusters must

10  consult with manuals or guidelines does not preclude their exercise of discretion

11  and independent judgment."); *accord*, In re Farmers Insurance Exchange, 481

12  F.3d at 1130 ("[T]he use of computer software to estimate claims does not

13  eliminate the need for discretion and judgment any more than does resort to other

14  reference works or to the opinions of appraisers and other experts.")

15       C. Individual Defendants

16       The plaintiffs' Amended Complaint includes as defendants Karl Meckert

17  and Kim Lowe.  According to Allstate, Meckert was during the time at issue the

18  Market Claim Manager (MCM) in charge of the MCO where Gaglione and Aiken

19  worked, and Lowe became the MCM in June, 2002 for the MCO where Slappy

20  worked.  Allstate argues that all claims against Meckert and Lowe must be

21  dismissed on the ground that they are not liable as a matter of law under the

22  FLSA for any unpaid overtime owed the plaintiffs.  The Court agrees with Allstate.

23       The FLSA requires that employers pay a minimum hourly wage to covered

24  employees.  "Employer" is defined to include "any person acting directly or

25  indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C.

26  § 203(d).  The Ninth Circuit holds that the definition of employer under the FLSA

-23-

1   is not limited by the common law concept of employer and that the FLSA

2   definition must be given an expansive interpretation in order to effectuate the

3   FLSA's broad remedial purpose. Lambert v. Ackerly, 180 F.3d 997, 1011-12 (9th

4   Cir. 1999) (en banc), *cert. denied*, 528 U.S. 1116 (2000).  The Ninth Circuit

5   therefore looks to the "economic reality" of the circumstances, holding that an

6   individual can be a FLSA employer if the individual exercises "control over the

7   nature and structure of the employment relationship" or "economic control" over

8   the relationship. *Id.* at 1012.  The factors the Ninth Circuit looks at to make this

9   determination include whether the individual (1) had a significant ownership

10  interest with operational control of significant aspects of the corporation's day-to-

11  day, (2) had the power to hire and fire employees, (3) the power to determine

12  salaries, and (4) the responsibility to maintain employment records. *Id.*; *see also,*

13  Baird v. Kessler, 172 F.Supp.2d 1305 (E.D.Cal. 2001), *aff'd,* 81 Fed.App. 249

14  (2003) (Affirmed for the reasons stated by the district court) (Court noted that the

15  Ninth Circuit considers various factors in determining who is a FLSA employer:

16  whether the alleged employer had the power to hire and fire employees,

17  supervised and controlled employee work schedules or conditions of

18  employment, determined the rate and method of payment, and maintained

19  employment records.)  Thus a corporate officer with "operational control of a

20  corporation's covered enterprise" is an employer along with the corporation and is

21  jointly and severally liable under the FLSA for unpaid wages. Donovan v. Agnew,

22  712 F.2d 1509, 1511 (1st Cir. 1983).

23       The Court concludes that Meckert and Lowe must be dismissed because

24  the plaintiffs have not raised any genuine issue of material fact as to whether

25  Meckert and Lowe had the required ability to control the crucial aspects of the

26  plaintiffs' work environment.  In support of its motion, Allstate has submitted the

1  uncontroverted affidavit of Charles Bashaar, its Human Resources Director,
2  wherein he stated that neither Meckert or Lowe played any role in determining
3  whether employees in any of the adjuster classifications should be exempt.
4  The plaintiffs, on the other hand, have not raised any cogent argument as to why
5  Meckert and Lowe should not be dismissed, much less submitted any significant
6  probative evidence supporting liability on their part.[10]

7          Therefore,

8          IT IS ORDERED that Defendants' Motion for Summary Judgment on all
9  Claims (**doc. #56**) is granted and the Amended Complaint (doc. #138) is
10  dismissed.  Plaintiffs Leonard Gaglione, Michael Aiken, and Maxine Slappy are
11  dismissed from this action with prejudice, and defendants Karl Meckert and Kim
12  Lowe are dismissed from this action with prejudice.

13          IT IS FURTHER ORDERED that Plaintiffs' Motion to Amend to Join
14  Additional Adjusters as Named Plaintiffs to Their FLSA Action (**doc. #122**) is
15  granted pursuant to Fed.R.Civ.P. 15(a) and LRCiv 7.2(i).  The plaintiffs, if they
16  still desire to do so, shall file their amended complaint adding plaintiffs Deborah L.
17  Smith, Richard K. McCauliff, Fitzroy H. DaSilva, and Chris Sweet no later than
18  **August 20, 2007.**

19

20          [10]  The plaintiff's response to this aspect of the summary judgment consists solely
21  of the following:

22          Finally, Allstate's contention that the MCM's should be dismissed from the
23          case is contrary to the FLSA and case law in the 9th Circuit. See *Bonnette*
            *v. California Health and Welfare Agency*, 704 F.2d 1465, 1468 (9th Cir.,
24          1983).[fn]  (FN) - To be supplemented with Maxine Slappy's affidavit.

25  Not only do the plaintiffs' statement of facts not appear to even mention Meckert and
    Lowe, the plaintiffs never submitted any supplemental affidavit from Slappy.
26

-25-

Case 2:04-cv-00015-PGR   Document 89   Filed 08/07/07   Page 26 of 26

IT IS FURTHER ORDERED that Defendants' Request to File Supple-mental Brief and Lodging of New Authority Relevant to the Pending Motion for Summary Judgment (**doc. #131**) and Defendants' Additional Request to File Supplemental Brief and Lodging of New Authority Relevant to the Pending Motion for Summary Judgment (**doc. #181**) are both granted.

IT IS FURTHER ORDER that Plaintiffs' Motion for Sanctions and Motion to Compel (**doc. #92**) are denied.[11]

DATED this 6th day of August, 2007.

Paul G. Rosenblatt
United States District Judge

---

[11]  The Motion for Sanctions is denied because the plaintiffs do not explain how this Court can enforce a pre-transfer order entered by Judge Gwin of the Northern District of Ohio whose meaning neither side fully understood and which Judge Gwin never clarified.

The Motion to Compel is denied without prejudice because, given the passage of time, this Court has no way of knowing how much of the motion, if any, still needs to be resolved.

-26-